CEMEX CONSTRUCTION MATERIALS
FLORIDA, LLC,

         Plaintiff,

v.                                       Case No.  3:16-cv-186-J-34JRK

ARMSTRONG WORLD INDUSTRIES,
INC.,

         Defendant.

_____

ARMSTRONG WORLD INDUSTRIES,
INC.,

         Counterclaim Plaintiff,

v.

CEMEX CONSTRUCTION MATERIALS
FLORIDA, LLC,

         Counterclaim Defendant.

_____

## ORDER

**THIS CAUSE** is before the Court on Plaintiff/Counterclaim Defendant CEMEX

Construction Materials Florida, LLC's Motion to Dismiss Second Amended Counterclaim

and Supporting Memorandum of Law (Doc. No. 63; CEMEX Motion), filed on March 29,

2017.  Defendant/Counterclaim Plaintiff Armstrong World Industries, Inc. filed a response

in opposition to the CEMEX Motion.  See Armstrong World Industries Inc.'s Response in

Opposition to CEMEX Construction Materials Florida LLC's Motion to Dismiss Second

Amended Counterclaim (Doc. No. 65; Response to CEMEX).  Accordingly, the motion is ripe for review.

## I.  Background

### A. Facts[1]

This action arises from a contractual relationship between a manufacturer and a distributor of building materials.  In its Second Amended Counterclaim (Doc. No. 49; SAC), Defendant/Counterclaim Plaintiff Armstrong World Industries, Inc. (Armstrong), a Pennsylvania corporation with its principal place of business in Lancaster, Pennsylvania, states that it is a manufacturer of "acoustical ceiling products, including but not limited to ceiling tiles, grid, acoustical wall panel and installation, maintenance and accessory products," which it collectively refers to as the "Ceiling Products" (Ceiling Products or Products).  SAC ¶¶ 1, 9.  Armstrong distributes its Ceiling Products via wholesale distributors located in specified geographic areas, known as "territories."  Id. ¶ 10.  In December of 2006, Armstrong entered into a non-exclusive distribution agreement (Distribution Agreement or Agreement) with Rinker Materials of Florida, Inc. (Rinker) in which it authorized Rinker to purchase and resell Armstrong's Ceiling Products.  See id. ¶¶ 12; Distribution Agreement.  The Distribution Agreement identifies Rinker's territory as specific counties in Florida, Georgia, and Alabama, see id. at ¶ 20, and as relevant to this action contains the following terms:

> [Distribution Agreement ¶ 1]: Armstrong appoints each Distributor to be its non-exclusive wholesale distributor located within the geographic area described in Attachment A hereto as Distributor's "Territory[]" . . .

---

[1]    In considering motions to dismiss, the Court must accept all factual allegations in the complaint as true, consider the allegations in the light most favorable to the plaintiff, and accept all reasonable inferences that can be drawn from such allegations. Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa Cnty., Fla., 21 F.3d 1531, 1534 (11th Cir. 1994).  As such, the facts recited here are drawn from the Second Amended Counterclaim, and may well differ from those that ultimately can be proved.

[Distribution Agreement ¶ 2]: Distributor will sell Ceiling Products to accounts serving the construction industry. Distributor is authorized to sell and distribute Ceiling Products only from those distribution locations within the Territory listed on Attachment A as "Distributor Locations." The term "Distributor" includes each authorized Distributor Location, whether or not owned by an affiliate or separate legal entity . . .

[Distribution Agreement ¶ 3]: Distributor is authorized to sell and distribute Ceiling Products (including will call or pick-up sales) only to accounts whose billing address is located in the Territory or for construction products located in the Territory. In the event Distributor sells or distributes Ceiling Products in violation of this section, and without prejudice to any other rights or remedies it may have, Armstrong may (1) bill back to Distributor any discount given by Armstrong on the Ceiling Products involved; (2) suspend any or all discounts or rebate programs to Distributor at the discretion of Armstrong; or (3) terminate Distributor . . .

[Distribution Agreement ¶ 4]: Distributor will use its best efforts to promote, sell and service all Ceiling Products within its Territory . . .

Id. ¶¶ 15-18; see also SAC, Ex. A: Armstrong World Industries, Inc. Building Products Division Non-Exclusive Distribution Agreement (Distribution Agreement) ¶¶ 1-4. The Distribution Agreement further provides that "sales of Ceiling Products outside Distributor's Territory in violation of paragraph 2" shall constitute a breach of the Distribution Agreement. SAC ¶ 19; Distribution Agreement ¶ 20(b). Notably, the Distribution Agreement is governed by Pennsylvania law. See Distribution Agreement ¶ 24.

In 2008, Plaintiff/Counterclaim Defendant CEMEX Construction Materials Florida, LLC (CEMEX) acquired Rinker and assumed the role as Armstrong's local distributor pursuant to the Distribution Agreement. See SAC ¶ 13. According to Armstrong, because the markets for Ceiling Products vary across geographic regions, Armstrong sold its Ceiling Products to CEMEX at a significant discount as compared to the wholesale price for the same Ceiling Products in other regions, such as New York. Id. ¶ 21. Armstrong based its pricing of products sold through CEMEX on its belief that CEMEX would only

distribute the Ceiling Products within its contractually-assigned territory. <u>See id.</u> ¶ 22. Indeed, it is Armstrong's position that CEMEX was not authorized to sell Ceiling Products "for distribution or redistribution" anywhere outside of its specified territory. <u>Id.</u> Armstrong asserts that this practice helps "encourage its distributors to promote and grow business within their territories," while simultaneously "maximiz[ing] Armstrong's sales and profits[.]" <u>Id.</u> ¶ 11. On occasion, Armstrong also provided CEMEX with a special pricing exception (SPE) based on CEMEX's representations that the Ceiling Products would be sold only to a specified contractor and used for a specified construction job within its assigned territory. <u>See id.</u> ¶ 23.

As early as 2009, Armstrong became aware that CEMEX had sold Ceiling Products for use in a construction project outside of its contractually-assigned territory. <u>Id.</u> ¶ 25. This prompted Armstrong to send CEMEX a letter reminding CEMEX of its obligations under the Distribution Agreement. <u>See id.</u> Then, in 2011, CEMEX allegedly began conspiring with Metro Interior Distributors Corporation (Metro),[2] a New York Corporation with its principal place of business in New York, to acquire Ceiling Products intended for distribution in Florida and ship them to New York for resale. <u>Id.</u> ¶ 30. The scheme purportedly began after Matt Sutherland, president of Sutherland Group, met with and spoke to Jimmy Alderson (Alderson), the CEMEX sales representative responsible for ordering Armstrong's Ceiling Products. <u>See id.</u> ¶ 31. After several meetings and

---

[2]  According to CEMEX, Metro is part of the Sutherland Construction Group (Sutherland Group), a group of companies "in the construction and building supply business[.]" <u>Id.</u> Prior to the events giving rise to this action, on or around September 9, 2004, Armstrong wrote to Sutherland Group's president to complain that Metro and its sister company, Hi-Lume, were improperly reselling Armstrong's Ceiling Products to contractors in the New York City and Long Island areas. <u>Id.</u> ¶ 27. Despite this complaint, Hi-Lume continued reselling Ceiling Products to Metro in violation of the terms of its contract with Armstrong, prompting Armstrong to terminate Hi-Lume as a "direct buying contractor." <u>Id.</u> ¶ 28.

phone calls between these two individuals, Metro and CEMEX "conspired [] to purchase over 20 million square feet of Armstrong Ceiling Products intended for distribution in Florida and transship[] the [P]roduct[s] hundreds of miles outside of CEMEX's authorized territory for resale to customers in New York, thereby providing Metro with sufficient quantities of [P]roducts to improperly hold itself out as an authorized distributor of Armstrong Ceiling Products." Id. ¶ 33. Initially, the scheme involved Metro placing orders with CEMEX for Armstrong's Ceiling Products, CEMEX ordering the Products from Armstrong, and CEMEX later billing Metro's credit card for the purchases.[3] See id. ¶¶ 32, 36. Metro would then arrange for a truck to pick up the Ceiling Products from CEMEX's Jacksonville location and haul them to New York. Id. ¶ 38. Later, "the parties" arranged for large shipping containers to be loaded with Ceiling Products and shipped to New York. Id. ¶ 39.

In furtherance of the purported scheme, Armstrong maintains that CEMEX and Metro took steps to conceal their illicit activities by, inter alia, removing SKU codes from certain Ceiling Products, misrepresenting the location of construction projects, and dealing in cash. See id. ¶¶ 34-35, 42. By way of example, Armstrong contends that CEMEX would input sales to Metro through its own "CASH 1268" account,[4] allowing CEMEX to avoid adding Metro as an account customer which would, in turn, have created a record that the sales to Metro were intended for shipment to, and use in, New York.

---

[3]     To facilitate the scheme, Armstrong avers that Metro and CEMEX "used email and telephone communications between New York and Florida[,]" as well as "telecommunications, email and online transactions" to process payments. Id. ¶ 37. CEMEX also used Armstrong's online sales entry system to place orders for Products. See id.

[4]     CEMEX's "CASH 1268" account was generally used "for small transactions for contractors picking up small amounts of goods for local projects." Id. ¶ 43. Between 2011 and 2013, CEMEX's cash sales to Metro averaged $44,247 per transaction, while its cash sales to other customers averaged $320 per transaction. See id.

See id. ¶ 43.  CEMEX also repeatedly failed to identify Metro on the list of its "top 10-15 accounts" which it provided annually to Armstrong, allegedly to hide all sales made to Metro, CEMEX's true largest customer.  See id. ¶¶ 44-45.  In other instances, CEMEX would request an SPE discount from Armstrong for use on a particular in-territory job site, "but then resell [some or all of] the material purchased under the SPE discount to Metro."  See id. ¶¶ 46-50.  Between 2011 and July of 2013, CEMEX ultimately sold and shipped approximately $7,300,000 in Ceiling Products to Metro in New York.  Id. ¶ 40.

In July of 2013, Armstrong noticed that CEMEX placed two unusually large orders prompting Armstrong to inquire as to the destination of the Ceiling Products and CEMEX to subsequently reveal that the products were intended for Metro in New York.  See id. ¶ 51.  Armstrong again informed CEMEX that out-of-territory sales were not permitted, and "CEMEX falsely promised that it would not sell any more [P]roduct[s] to Metro[.]"  Id.  According to Armstrong, CEMEX's representatives then began making a number of misrepresentations regarding the nature and scope of its sales to Metro, including, but not limited to:

- A July 11, 2013 phone call between Joe Kirkpatrick (Kirkpatrick) – CEMEX's General Manager – and Frank Pasquerello (Pasquerello) – Armstrong's Area Manager – where Kirkpatrick represented to Pasquerello that the shipments to Metro were "for export out of the port of Jacksonville" when in reality the shipments were "transported to Metro via truck and/or railroad to New York."  Id. ¶ 52.

- A July 18, 2013 phone call between Bo Salters (Salters) – another manager for CEMEX – and Pasquerello in which Salters represented to Pasquerello that Sutherland approached CEMEX on July 15 about making a cash purchase of Ceiling Products in full container quantities and threatened to sue CEMEX and Armstrong if they did not sell him the Products.  See id. ¶ 53.

- A July 24, 2013 e-mail from Kirkpatrick to Pasquerello falsely informing Pasquerello that the only purchases of Ceiling Products by Metro were two containers in April and May of 2013 destined for export out of the country from the port of Jacksonville.  See id. ¶¶ 55, 57-58.

- A July 29, 2013 e-mail from Kirkpatrick to Pasquerello informing Pasquerello that CEMEX's records only indicated one cash transaction involving Metro. See id. ¶ 60.

- A September 10, 2013 meeting with Kirkpatrick, Salters, and Pasquerello in which the CEMEX managers knowingly concealed sales from CEMEX to Metro and represented that sales of a particular Ceiling Product were properly within CEMEX's assigned territory. See id. ¶¶ 64-65.

- An October 4, 2013 e-mail from Kirkpatrick to Pasquerello in which Kirkpatrick provided Pasquerello with a list of the largest sales of a particular Ceiling Product from CEMEX's Jacksonville office but deliberately omitted any sales to Metro, to which "CEMEX had sold [] over 1.5 million square feet of [Ceiling Product] for $1.7 million during the 18 months prior to the e-mail." Id. ¶ 68.

- An October 10, 2013 e-mail from Kirkpatrick to Pasquerello falsely indicating that CEMEX made no additional sales to Metro under its "CASH 1268" account. See id. ¶ 71.

Although CEMEX allegedly agreed to stop "bootlegging" Armstrong's Products outside of its assigned territory, Armstrong avers that CEMEX and Metro subsequently conspired to secretly continue this practice through the use of a straw purchaser, Acoustical and Interior Products (Acoustical), which effectively acted as an agent for CEMEX.[5] See id. ¶¶ 74-75. CEMEX and Metro allegedly implemented the revised scheme in the following manner: Jimmy Alderson (Alderson), the CEMEX sales representative responsible for making sales to Metro, was a friend and brother-in-law of the owner of Acoustical. See id. ¶ 79. Taking advantage of this relationship, Alderson would submit Metro's sales orders to Armstrong as if they were intended for Acoustical, despite the fact that these sales orders were not made by Acoustical. See id. ¶ 81. Armstrong would then ship the Ceiling Products to CEMEX's Jacksonville location "under

---

[5] Armstrong also alleges that, when Acoustical was not available to participate in the scheme, CEMEX would process sales to Metro via another local company – Southeastern Building and Supply – an inactive business entity owned by the general manager of CEMEX's Jacksonville office, Dave McGinty (McGinty). See id. ¶¶ 92, 94.

the mistaken understanding and belief that the products were going to be resold [to Acoustical] within CEMEX's territory pursuant to the terms of the Distribution Agreement[,]" but in reality the Ceiling Products would be sold to Metro. Id. ¶ 82. As part of this arrangement, Metro would pay Acoustical for the Ceiling Products using its own credit card, and Acoustical would use these funds to pay CEMEX directly. Id. ¶ 86. Acoustical would receive "a flat margin of 5% on the sales[,]" with the rest of the mark-up going to CEMEX. Id. ¶ 84.

Meanwhile, in 2014, CEMEX hired McGinty to head its Jacksonville office. Id. ¶ 94. In April of 2015, Armstrong again became suspicious of CEMEX's sales, see id. ¶ 97, leading Armstrong to request a "breakdown of all the Armstrong ceiling tile and grid that CEMEX sold to Acoustical in 2015[,]" id. ¶ 98. CEMEX refused to provide the requested information, with McGinty informing Armstrong via e-mail that Acoustical would not allow it to do so because it was a competitor of CEMEX. See id. ¶ 99. Not satisfied with this response, Armstrong pressed further. See id. ¶¶ 101-02. Soon thereafter, McGinty purportedly admitted to Pasquerello that the Ceiling Products intended for Acoustical actually went to Metro in New York. See id. ¶ 104. By the time Armstrong discovered that CEMEX was using Acoustical as a straw purchaser, CEMEX had made over $6,000,000 in sales to Metro via Acoustical. See id. ¶ 77. As a result of CEMEX's alleged misrepresentations and continuing violations of the Distribution Agreement, Armstrong terminated its contract with CEMEX on or around May 7, 2015, effective as of July 6, 2015. See id. ¶ 107. CEMEX subsequently terminated McGinty from his position with CEMEX. See id. ¶ 108. Also in May of 2015, Sutherland met with a representative from Armstrong and acknowledged "Metro's bootlegging activities." Id. ¶ 113. According

to Armstrong, during this meeting, Sutherland "opened a briefcase full of cash and showed it to the Armstrong representative while bragging about how easy it was to purchase Armstrong Ceiling Products for cash and ship them to New York." Id. Sutherland also threatened to continue the practice "unless Armstrong agreed to appoint Metro as an authorized distributor and provide Metro with favorable pricing in the New York metropolitan area." Id. In accordance with the terms of the Distribution Agreement, and particularly that provision which allowed Armstrong to bill back discounts given on Ceiling Products sold or distributed outside CEMEX's assigned territory, Armstrong later sent CEMEX an invoice for approximately $4,600,000 in illegitimately-obtained discounts; however, CEMEX has refused to pay the invoice. Id. ¶ 114.

### B. Procedural History

On February 26, 2016, alleging the existence of diversity jurisdiction, Armstrong removed this action, which CEMEX originally filed in Duval County Circuit Court, to federal court. See generally Notice of Removal (Doc. No. 1). In its single count complaint CEMEX seeks a declaratory judgment regarding its "rights, duties, and obligations with respect to the Distribution Agreement." See generally Complaint (Doc. No. 2; Complaint). Following the removal, Armstrong filed an answer and counterclaims in which it sought damages from not only CEMEX but also Metro. See generally Armstrong World Industries, Inc.'s Answer and Counterclaims (Doc. No. 3; Counterclaim). Upon review, this Court, sua sponte, issued an order (Doc. No. 6) striking the Counterclaim as an impermissible "shotgun pleading." Thereafter, on March 10, 2016, Armstrong filed its Amended Counterclaim, see generally Armstrong World Industries, Inc.'s Answer and Amended Counterclaims (Doc. No. 7), and on February 22, 2017, with leave of Court,

Armstrong filed the SAC, see generally SAC. Thus, the SAC is the operative pleading with respect to the counterclaims in this action.

Both Metro and CEMEX filed motions to dismiss the SAC, see CEMEX Motion; Counterclaim Defendant Metro Interior Distributors Corporation's Motion to Dismiss Armstrong's Second Amended Counterclaim and Supporting Memorandum of Law (Doc. No. 64; Metro Motion), and Armstrong filed responses in opposition, see Response to CEMEX; Armstrong World Industries Inc.'s Response in Opposition to Metro Interior Distributor's Corp.'s Motion to Dismiss Second Amended Counterclaim (Doc. No. 66; Response to Metro). After the CEMEX Motion and Metro Motion had been fully briefed, but before the Court had entered an order resolving the motions, Metro and Armstrong advised the Court that they had reached a settlement as to the claims between them. See Joint Motion to Drop Counterclaim Defendant Metro Interior Distributors Corp. as a Party by Counterclaim Plaintiff and Notice of Withdrawal of Metro's Motion to Dismiss Pursuant to Settlement as to Counterclaim Defendant Metro (Doc. No. 69; Joint Notice) filed on December 21, 2017. In the Joint Notice, Armstrong and Metro requested that the Court drop Metro as a party and dismiss the claims Armstrong asserted against Metro with prejudice. See id. at 1. Additionally, Metro withdrew the Metro Motion. See id. at 2. Metro and Armstrong advised the Court that counsel for CEMEX did not agree to the requested relief "as phrased." Id. In light of the parties' settlement, the Court construed the Joint Notice as a joint stipulation of dismissal with prejudice as to the claims between Armstrong and Metro, dismissed the claims against Metro, and terminated the Metro Motion. See Order (Doc. No. 70). As a result, the only remaining counterclaims in this action are the claims brought against CEMEX in the SAC.

In the SAC, Armstrong brings six claims against CEMEX.  See id.  Specifically, Armstrong asserts claims for breach of the Distribution Agreement (Count I), fraud/misrepresentation (Count III), unjust enrichment (Count IV), civil conspiracy (Count V), violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 et seq. (Count VII), violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) (Count VIII), and conspiracy to violate the RICO Act, 18 U.S.C. § 1962(d) (Count IX).  See generally SAC.  In the CEMEX Motion, CEMEX seeks dismissal of all claims pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure (Rule(s)), for failure to state a claim upon which relief can be granted.  See generally CEMEX Motion.

Following the dismissal of Metro, on January 17, 2018, CEMEX filed CEMEX Construction Materials Florida, LLC's Motion to Amend Motion to Dismiss (Doc. No. 71; Motion to Amend).  In the Motion to Amend, CEMEX seeks to amend the CEMEX Motion to include arguments raised by Metro in the Metro Motion but that CEMEX previously opted not to include in the CEMEX Motion.  Specifically, CEMEX wishes to amend the CEMEX Motion to include the following arguments:

1.  With regard to the FDUTPA claim in Count VII, CEMEX seeks to argue that it fails to state a claim because:

    a.  Armstrong lacks standing;

    b.  the claim is not pled with particularity; and

    c.  it fails to allege conduct likely to cause harm to consumers.[6]

---

[6]      CEMEX's request to amend to argue that Armstrong fails to allege consumer harm is curious given that CEMEX raised that argument in the CEMEX Motion.  See CEMEX Motion at 21.

2.  With regard to the RICO claim in Count VIII, CEMEX seeks to argue that it fails

to:

    a.  allege a RICO enterprise, a pattern, and continuity;

    b.  plead fraud with particularity; and

    c.  allege causation between CEMEX's activity and Armstrong's injury.

<u>See</u> Motion to Amend at 7.  CEMEX asserts that amendment is necessary to assure a fair and swift adjudication of the matter, that amendment will not be prejudicial because Armstrong will not face any new or unexpected arguments, and that CEMEX will be prejudiced if it cannot amend because it relied on its expectation that the Court would adjudicate the Metro Motion.  <u>See generally</u> Motion to Amend.

    Armstrong opposes the Motion to Amend.  <u>See</u> Armstrong's Response in Opposition to CEMEX Construction Materials Florida, LLC's Motion to Amend Motion to Dismiss (Doc. No. 74; Amendment Opposition).  It asserts that the deadline for filing motions to dismiss has long since passed, that it will be prejudiced by the expense and delay of additional briefing, and that CEMEX will not be prejudiced because it can raise the arguments in a summary judgment motion which is due to be filed in early April.

    Upon review of the record, the Court is convinced that while it has discretion to grant the Motion to Amend, under the circumstances of this case, the Motion to Amend should be denied.  In reaching this conclusion, the Court finds that CEMEX has not provided a sufficient reason for its failure to raise these arguments that were fully available to it at the time it filed the CEMEX Motion.  <u>See</u> <u>Miller v. M.D. Science Labs, LLC</u>, No. 10-60956-Civ., 2010 WL 4102908 (S.D. Fla. Oct. 18, 2010); <u>Factory Direct Tires, Inc. v. Cooper Tire and Rubber Co.</u>, No. 3:11cv255/RV/EMT, 2012 WL 2873232 (N.D. Fla. June

13, 2012) (Report and Recommendation adopted in <u>Factory Direct Tires, Inc. v. Cooper Tire and Rubber Co.</u>, No. 3:11cv255/RV/EMT, 2012 WL 2873153 (N.D. Fla. July 12, 2012)).

In the Motion to Amend, CEMEX asserts that it opted to defer to Metro's expertise and relied on Metro to offer more extensive arguments on the FDUTPA and RICO claims. This argument fails for several reasons. First, nothing in the CEMEX Motion suggests that it was relying on any of Metro's arguments. <u>See</u> <u>generally</u> CEMEX Motion. Rather, CEMEX independently identified deficiencies in Armstrong's pleading and presented legal arguments in support of dismissal based on those deficiencies.[7] Notably, had CEMEX attempted to adopt or incorporate arguments raised by Metro, it would have acted in derogation of the Local Rules of the United States District Court, Middle District of Florida. <u>See</u> Local Rule 3.01(a).

Next, CEMEX provides no authority or explanation for its "expectation" that in adjudicating the Metro Motion the Court would have dismissed <u>sua</u> <u>sponte</u> claims brought against CEMEX on a basis CEMEX never even raised. The mere fact that Metro raised the arguments would not entitle CEMEX to a <u>sua</u> <u>sponte</u> dismissal based on arguments CEMEX opted not to assert. A district court generally may not <u>sua</u> <u>sponte</u> dismiss a claim where the court has "provided the plaintiff with neither notice of its intent to dismiss the complaint nor an opportunity to respond." <u>Jenkins v. Deutsche Bank Nat'l Trust Co.</u>, No. 07-22463-COV-GOLD/MCALEY, 2009 WL 10667428, *8 (S.D. Fla. Sept. 28, 2009) (citing <u>Jefferson Fourteenth Assocs. v. Wometco de Puerto Rico, Inc.</u>, 695 F.2d 524, 527 (11th

---

[7] Indeed, far from appearing to rely on one of the arguments raised by Metro, such as lack of FDUTPA standing, CEMEX actually acknowledged the possible argument but declined to urge it as a basis for dismissal, arguing instead only the absence of consumer injury. <u>See</u> CEMEX Motion at 19 ("Regardless of whether the standing requirement survives, . . .).

Cir. 1983)).  While the fact that Armstrong was presented with similar arguments by Metro might in some circumstances serve as sufficient notice, here, given CEMEX's apparent conscious decision not to include the arguments, depriving Armstrong of an opportunity to respond separately to address the sufficiency of its claims specifically against CEMEX would not be appropriate.

Moreover, the Court declines to accept CEMEX's claim of prejudice.  According to CEMEX, it made a conscious decision not to include certain arguments in the CEMEX Motion.  Having done so, it cannot now claim that it will be prejudiced if the Court does not relieve it of that decision.  Last, the Court finds that allowing CEMEX to amend the CEMEX Motion would unfairly prejudice Armstrong and delay these proceedings.  If the Court were to allow CEMEX to amend its motion, Armstrong would be entitled to respond to the arguments as framed by CEMEX in the amended motion.[8]  Armstrong would be prejudiced by incurring the additional cost to do so, as well as the resulting delay in the Court's ability to resolve the CEMEX Motion.  See Factory Direct Tires, 2012 WL 2873232, at *1 (noting that "it is particularly inappropriate" to allow amendment of a motion after a response has been filed).  Indeed, allowing the CEMEX Motion to be amended and then awaiting complete briefing would certainly delay entry of a ruling on the CEMEX Motion.  CEMEX filed the CEMEX Motion on March 29, 2017.  It had been fully briefed for eight months before CEMEX sought leave to amend it.  Contrary to CEMEX's claim that amendment would help achieve a swift and fair resolution, it likely would result in the

---

[8]    While CEMEX appears to suggest that no additional briefing would be necessary, it fails to explain why, if the Court were to allow CEMEX to amend its motion, justice would not require that Armstrong also be permitted to amend its response.  Indeed, one of the arguments CEMEX seeks to add, the failure to allege causation between CEMEX's actions and Armstrong's injury is a unique argument that would not have been addressed in a response to the Metro Motion.

parties having to brief the issues in motions for summary judgment without the benefit of a ruling on the CEMEX Motion. Such an outcome would be neither fair nor efficient. For all of the foregoing reasons, the Court in the exercise of its discretion determines that the Motion to Amend is due to be denied. As such, the Court limits its consideration of the sufficiency of Armstrong's SAC to the arguments set forth in the CEMEX Motion.

## II.    Standard of Review

In ruling on the CEMEX Motion, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Omar ex. rel. Cannon v. Lindsey, 334 F.3d 1246, 1247 (11th Cir. 2003) (per curiam). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary," the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). The "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do." Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

In addition to the minimal pleading requirements outlined above, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988) (quotation omitted). Thus, Rule 9(b) "'ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . [and] protects defendants from harm to their goodwill and reputation.'" Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1277 (11th Cir. 2006) (quotation omitted) (alterations in Wagner). Although "'alternative means are also available[,]'" the requirements of Rule 9(b) may be satisfied by specific allegations as to "'date, time or place.'" See Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972-73 (11th Cir. 2007) (quoting Durham, 847 F.2d at 1511). Thus, a complaint satisfies Rule 9(b) if it

> sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

Id. at 972 (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)). Nonetheless, "Rule 9(b) does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made[,]" and thus, for purposes of Rule 9(b), "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008).

## III.   Analysis

### A.  Count I: Breach of Contract

With regard to Armstrong's Count I claim for breach of contract, CEMEX principally argues that Armstrong failed to allege facts sufficient to demonstrate a breach of the territorial restriction provisions of the Distribution Agreement.  See CEMEX Motion at 7-8.  Armstrong counters by asserting that it alleged that CEMEX breached these provisions first by selling Ceiling Products directly to Metro, and then by covertly continuing to make improper sales to Metro via third-party straw purchasers.  See Response to CEMEX at 6-7.  Moreover, Armstrong argues that these actions amount to a breach based upon both the plain meaning of the Distribution Agreement's language as well as its reasonable interpretation, pursuant to Pennsylvania law, should any such interpretation be necessary.  See id. at 16-19.

Because the Court's jurisdiction over this action is based on diversity of citizenship, the Court must apply Florida's conflict of law rules to determine which state's law is controlling with respect to each common law claim under consideration. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Trumpet Vine Invs. N.V. v. Union Capital Partners I, Inc., 92 F.3d 1110, 1115 (11th Cir. 1996).[9] Here, the Distribution Agreement contains a Pennsylvania choice of law provision that states, "[t]he parties further agree that the laws of the Commonwealth of Pennsylvania will govern the interpretation of this agreement." Distribution Agreement ¶ 24. Florida courts will enforce contractual choice of law provisions "unless the law of the chosen forum contravenes strong public policy." Interface Kanner, LLC v. JPMorgan Chase Bank, N.A., 704 F.3d 927, 932 (11th Cir. 2013) (quoting Maxcess, Inc. v. Lucent Techs., Inc., 433 F.3d 1337, 1341 (11th Cir. 2005) (per curiam)). Neither CEMEX nor Armstrong argue that applying Pennsylvania law to this claim would violate Florida's public policy, and both parties apply Pennsylvania law in their analysis of this claim. See CEMEX Motion at 8; Response to CEMEX at 16-18. Because the Court independently identifies no public policy conflict, the Court will apply Pennsylvania law in evaluating Armstrong's breach of contract claim.

Under Pennsylvania law, the elements of a cause of action for breach of contract are: "(1) the existence of a contract, including its essential terms; (2) a breach of the duty imposed by the contract; and (3) damages." See, e.g., Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003). The party asserting a breach bears the burden of proving these elements, including the meaning of the terms of the contract. See Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 102 (3d Cir. 2001). In

---

[9]    The Court is obligated to make a separate choice of law determination for each issue under consideration. Trumpet Vine Invs. N.V., 92 F.3d at 1115.

evaluating the terms of a contract, a court must first determine whether the contract before it is ambiguous.  See generally Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994).  In doing so, the contract must be read "as a whole," in other words, "all provisions [] are to be read together and construed according to their clear meaning so as to avoid any ambiguity . . .".  Piechota v. Hartford Fire Ins. Co., Civ. No. 11-7188, 2013 WL 271809, at *1 (E.D. Pa. Jan. 23, 2013) (citations omitted).[10]  If the contract's language is clear and unambiguous, its meaning "must be determined by its contents alone."  Capek v. Devito, 767 A.2d 1047, 1050 (Pa. 2001) (citation omitted). Indeed, Pennsylvania law presumes that a contract clearly conveys its parties' intent, and as such, a contract will not be deemed ambiguous as long as a court can determine its meaning via reference to the basic facts on which its meaning depends.  See Armstrong World Indus., Inc. v. Robert Levin Carpet Co., No. Civ. A. 98-CV-5884, 1999 WL 387329, at *3 (E.D. Pa. May 20, 1999) (citing Samuel Rappaport Family P'ship v. Meridian Bank, 657 A.2d 17, 21-22 (Pa. Super. Ct. 1995)).  Moreover, ambiguity does not arise merely because the parties do not agree on the contract's proper construction, as the case may be here.  See id.  However, if the court finds that the contract's language is ambiguous, or reasonably susceptible to different constructions and capable of being understood in more than one sense, "then the interpretation of the contract is left to the factfinder, to resolve the ambiguity in light of extrinsic evidence."  Hullett, 38 F.3d at 111 (citing Stendardo v. Fed. Nat'l Mortg. Ass'n, 991 F.2d 1089, 1094 (3d Cir. 1993)).  With these principles in mind, the Court turns to the parties' arguments.

---

[10]  "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Regarding paragraph two of the Distribution Agreement, see supra at 3, CEMEX relies principally on its view of the plain meaning of the word "from" to argue that "[t]he sales at issue were alleged to have all been sold from [CEMEX's] Jacksonville location, which was squarely in the [t]erritory defined by the Distribution Agreement." CEMEX Motion at 10. Based on this interpretation, CEMEX contends that Armstrong wholly failed to allege facts in support of its position that CEMEX sold Products from unauthorized distributor locations, thereby precluding a claim for breach of paragraph two. See id. In response, Armstrong emphasizes that the manifest intent of paragraph two was to establish a link between sales and geographic location, allowing Armstrong to secure a presence in CEMEX's contractually-assigned territory while simultaneously encouraging CEMEX to cultivate sales in the construction industry within that territory. See Response to CEMEX at 18. According to Armstrong, this interpretation is supported by paragraph twenty's express acknowledgement that "sales of Ceiling Products outside Distributor's Territory" constitute a breach of the Agreement. Id. at 19 (emphasis in original). Accordingly, Armstrong concludes that CEMEX violated paragraph two by: (1) selling Ceiling Products to Metro indirectly via straw purchasers under the theory that the straw purchasers' locations were not authorized distributor locations according to the terms of the Agreement; and (2) making sales in New York pursuant to Metro and CEMEX's conspiracy to fabricate a New York distributorship. See id. at 13-14 (citing SAC ¶¶ 75-84).

CEMEX also contends that it has not violated paragraph three of the Agreement, see supra at 3, because in its view a violation of this provision can occur only when CEMEX makes a sale that is both to an account whose billing address is located outside

the contractually-assigned territory <u>and</u> for a construction project located outside the contractually-assigned territory. <u>See</u> CEMEX Motion at 7-8 (emphasis added). Under this view, CEMEX argues that it cannot have breached this provision for any sales of Ceiling Products to both Metro directly and indirectly via the straw purchasers, even if these purchasers later resold the Ceiling Products to other purchasers outside the territory, because in both instances the billing address for the sales were within CEMEX's assigned territory. <u>See</u> <u>id.</u> at 9. With respect to the direct sales, Armstrong counters that, although CEMEX's direct sales to Metro used the billing address of CEMEX's own facility in Jacksonville, the Distribution Agreement prohibits these types of "will call or pick-up sales" intended for out-of-territory use. <u>See</u> Response to CEMEX at 15. With respect to the indirect sales, Armstrong contends that the use of straw purchasers "does not legitimize CEMEX's continued sales to Metro or alter the terms or intent of the territorial limitations in the Distribution Agreement." <u>Id.</u> Additionally, Armstrong avers that it would be unreasonable to construe this provision in the manner suggested by CEMEX, as it would allow CEMEX to intentionally circumvent territorial restrictions by selling to an intermediary. <u>See</u> <u>id.</u> at 19-20.

Under Pennsylvania law, "[i]f a writing is not ambiguous, it is appropriate for a district court to resolve the issue of contract interpretation as a matter of law, but typically on summary judgment rather than a motion to dismiss." <u>Masciantonio v. SWEPI LP</u>, No. 4:13-CV-0797, 2014 WL 4441214, at *6 n. 5 (M.D. Pa. Sept. 9, 2014). At this stage of the proceeding, the Court is not persuaded to adopt CEMEX's unilateral interpretation of the scope of the Distribution Agreement's territorial restriction provisions. Based on a review of the Distribution Agreement as a whole, and accepting the facts in the light most

favorable to Armstrong, the Court concludes that Armstrong has pled sufficient facts to state a plausible claim for breach of the Distribution Agreement. [11] Accordingly, the Court determines that the CEMEX Motion is due to be denied as to the breach of contract claim in Count I of the SAC.

## B. Count III: Fraud/Misrepresentation

In seeking dismissal of Armstrong's fraudulent misrepresentation claim, CEMEX contends that Armstrong cannot "repackage" its breach of contract claim as a separate claim of fraud. See CEMEX Motion at 10. In support, CEMEX argues that the fraud claim is "based on precisely the same conduct as [the] breach of contract claim" and therefore fails because Armstrong has not alleged a tort independent of the breach of contract. See CEMEX Motion at 11-12. Armstrong responds by arguing that "[i]ndepedent of its breach, CEMEX lied to Armstrong, and Armstrong relied on those misrepresentations to its detriment" and that "CEMEX's misrepresentations to Armstrong about its sales to Metro . . . constitute actionable fraud." Response to CEMEX at 23.

To state a claim for fraudulent misrepresentation under Florida law,[12] a plaintiff must allege: "(1) a false statement concerning a material fact; (2) knowledge by the person making the statement that it was false; (3) intent by the person making the

---

[11]     CEMEX also argues that Armstrong has failed to allege a breach of paragraph four's requirement that CEMEX "use its best efforts to promote, sell and service all Ceiling Products within its [t]erritory[.]" CEMEX Motion at 9. CEMEX claims that this allegation is "not supported by any well-pleaded facts[,]" Id. Armstrong responds by noting that it has alleged "that CEMEX directed the majority of its sales activities . . . to Metro from 2011 to 2015 for distribution in New York[.]" Response to CEMEX at 14 (citing SAC ¶¶ 8, 30, 33, 44-45, 60, 77, 140-41). Viewing the allegations in the light most favorable to Armstrong as the Court must at this stage of the proceeding, the Court concludes that Armstrong has alleged sufficient facts to state a claim for breach of this provision at this time. See Haymond v. Lundy, No. CIV. A. 99-5048, 2001 WL 15956, at *6 (E.D. Pa. Jan 5, 2001) (citation omitted) (noting that "[a] breach of a contractual promise to use best efforts is [also] actionable under Pennsylvania [l]aw").

[12]     Both parties agree that Florida law should govern this claim. See CEMEX Motion at 10-12; Response to CEMEX at 20-24.

statement to induce another's reliance; and (4) reliance by such other person on the misrepresentation." Artec Grp., Inc. v. Chugach Mgmt. Servs., Inc., 470 F. Supp. 2d 1353, 1356 (M.D. Fla. 2006) (citing Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985)).  Notably, where a party is in contractual privity with another, to bring a valid tort claim, the party must establish that the tort is independent of any breach of contact.  Freeman v. Sharpe Resources Corp., No. 6:12-cv-1584-Orl-22TBS, 2013 WL 2151723, *7 (M.D. Fla. May 16, 2013) (citing Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc., 110 So. 3d 399, 401, 408 (Fla. 2013)) (Pariente, J. concurring) (citing Lewis v. Guthartz, 428 So. 2d 222, 224 (Fla. 1982)).  In her concurrence in Tiara Condo, Justice Pariente explained the reason for this requirement

> "when the parties have negotiated remedies for nonperformance pursuant to a contract, one party may not seek to obtain a better bargain than it made by turning a breach of contract into a tort for economic loss."

Id. (quoting Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc., 891 So. 2d 532, 542 (Fla. 2004).

Since the Tiara Condo decision, the Eleventh Circuit Court of Appeals has continued to recognize that Florida law presents an additional hurdle for one seeking to pursue a tort claim against a party with whom it is in privity, "namely that a party still must demonstrate that . . . the tort is independent of any breach of contract claim."  Lamm v. State St. Bank & Trust, 749 F.3d 938, 947 (11th Cir. 2014); Lookout Mountain Wild Animal Park, Inc. v. Stearns Zoological Rescue & Rehab. Ctr., Inc., 553 Fed. Appx. 864, 866 (11th Cir. 2014) (per curiam) (citation omitted) ("Finally, we are also not persuaded that plaintiff has identified any tortious acts that are sufficiently independent of the alleged breach of contract to render the tort claims viable."); see also Osan v. Verizon Fla. LLC,

No. 8:15-CV-104-T-36TGW, 2016 WL 2745001, at *4 (M.D. Fla. May 11, 2016) (dismissing a fraud claim where "the alleged claim [] is precisely the same as a potential breach of contract claim").

Consistent with this authority, district courts within Florida have held that it "'is well settled that a plaintiff may not recast causes of action that are otherwise breach-of-contract claims as tort claims.'" <u>Sun Life Assur. Co. of Canada v. Imperial Holdings Inc.</u>, No. 13-80305-Civ-Brannon, 2016 WL 10565034, at *5 (S.D. Fla. Sept. 22, 2016) (citing <u>Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.</u>, No. 13-61687-CIV, 2014 WL 2215770 (S.D. Fla. May 29, 2014)). With regard to a fraud claim, one court explained that "the critical inquiry focuses on whether the alleged fraud is separate and apart from the performance of the contract." <u>Id.</u> (quoting <u>Kaye</u>, 2014 WL 2215770, at *4). In that regard,

> [a]n alleged fraud is not separate from the performance of the contract where the misrepresentations forming the basis for the fraud also form the basis for the breach of contract claim. . . . <u>Kaye</u>, 2014 WL 2215770, at *4 (rejecting fraud claim where "[a]lthough Kaye attempts to characterize his claim as sounding in fraud, the factual allegations reveal nothing more than a purported breach of contract."); <u>Alhassid v. Bank of Am., N.A.</u>, 60 F. Supp. 3d 1302, 1318 (S.D. Fla. 2014) (holding that fraud claim failed as a matter of law where "Plaintiff's have not pleaded any breach or injury separate and apart from their breach of contract claims").

<u>Id.</u> Put differently, where the alleged fraudulent misrepresentation is "inextricably intertwined" with the performance of a contract, there is no cognizable claim sounding in fraud. <u>S. Wind Aviation, LLC v. Cessna Aircraft Co.</u>, No. 6:12-CV-1376-ORL-22DAB, 2014 WL 12570958, at *6 (M.D. Fla. July 15, 2014). Nevertheless, Florida courts recognize the specific intentional tort of fraud in the inducement as an independent fraud claim that can be brought despite the existence of contractual privity. <u>Dantzler Lumber & Exp. Co. v. Bullington Lumber Co., Inc.</u>, 968 F. Supp. 1543, 1546 (M.D. Fla. 1997).

Here, Armstrong alleges that CEMEX: (1) made a number of knowingly false and misleading statements in regards to "the existence, scope, and extent of CEMEX's sales to Metro[,]" (2) "concealed [] continued sales through partial disclosure of the sales to Metro without disclosing all material facts[,]" and (3) requested SPE discounts for construction projects that were falsely represented to be in its territory.  Response to CEMEX at 20-21 (citing SAC ¶¶ 30-114, 152, 154-56).  Armstrong purportedly relied on these misrepresentations by not acting to stop the bootlegging, a practice that violated the contract, continuing to supply Ceiling Products destined for transshipment to New York, and agreeing to provide SPE discounts for non-Florida jobs.  See id. at 21 (citing SAC ¶¶ 73, 109-10, 153, 155, 157-59).  Hence, in arguing against dismissal of its fraud claim, Armstrong asserts that it relies on two sub-categories of fraud claims: fraudulent inducement and fraudulent concealment.  The Court will address each in turn.

With respect to the allegation of fraudulent inducement, Armstrong argues that CEMEX's misrepresentations made to obtain additional SPE discounts are independent fraud claims because "the Distribution Agreement itself does not address SPE discounts."  Response to CEMEX at 23.  Armstrong further argues that CEMEX made the misrepresentations to obtain the discounts and Armstrong relied on them.  See id.  Notably, CEMEX does not suggest what provision of the Distribution Agreement governs its request for, or receipt of, SPE discounts.  Viewing the allegations in the light most favorable to Armstrong, the Court cannot definitively conclude that the misrepresentations made to obtain SPE discounts relate solely to the performance of the contract.

In support of its allegations of fraudulent concealment, Armstrong citing Gutter v. Wunker, 631 So. 2d 1117, 1118-119 (Fla. Dist. Ct. App. 1994) (per curiam) (citations

omitted), urges that "where a party to an arm's length transaction undertakes to disclose information, all material facts must be disclosed." Notably, a review of <u>Gutter</u> discloses that the parties there had no contractual relationship casting doubt on its persuasive value here. Regardless, Armstrong's purported fraudulent concealment claim fails because the alleged misrepresentations which Armstrong asserts CEMEX used to conceal CEMEX's true actions are inextricably intertwined with its performance of the contract. Indeed, as alleged by Armstrong, it is by virtue of the misrepresentations that CEMEX accomplished the alleged breach of the Distribution Agreement. "Where the facts surrounding a breach of contract action are indistinguishable from an alleged tort, and where the alleged tort does not cause harm distinct from that caused by the breach of contract, a plaintiff is barred from bringing a separate tor action." <u>Eye Care Int'l, Inc. v. Underhill</u>, 92 F. Supp. 2d 1310, 1315 (M.D. Fla. 2000) (quoting <u>Serina v. Albertson's, Inc.</u>, 744 F.Supp. 1113, 1117-18 (M.D. Fla. 1990)). Indeed, the <u>Eye Care</u> court noted that "an independent tort requires proof of facts separate and distinct from the breach of contract." <u>Id.</u> (quoting <u>HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.</u>, 685 So. 2d 1238, 1239 (Fla. 1996)). Here, in its fraud claim Armstrong asserts no facts or substantive allegations distinct from those asserted in support of its breach of contract claim. It also fails to identify any damages flowing from the fraudulent concealment that are distinct from the breach of contract. While it is possible Armstrong could have pled such damages, it has not done so.

Notably, in its Response to CEMEX and in support of its claim that the fraud is an independent tort, Armstrong argues that absent the fraud "Armstrong would not have provided CEMEX with any discounts, would have terminated its relationship with CEMEX

and would have stopped the bootlegging scheme sooner than it did." Response to CEMEX at 24. All of those damages appear to be indistinguishable from Armstrong's claim for damages based on the breach of contract. "When the parties are in privity, contract principles are generally more appropriate for determining remedies for consequential damages that the parties have, or could have, addressed through their contractual agreement." Am. Aviation, 891 So. 2d at 536-37. Armstrong's remedy, therefore, is found in its claim for breach of contract. Accordingly, with the exception of the claims based on the provision of additional SPE discounts, Armstrong's allegations of fraud are more properly characterized as allegations of fraud in the performance of the contract, and as such the fraud claim premised on those allegations is not cognizable under Florida law. See, e.g., United States, ex rel. Oreo Debris, Inc. v. Ashbritt, Inc., No. 09-20458-CIV, 2010 WL 342649, at *1 (S.D. Fla. Jan. 29, 2010). The Court therefore determines that the CEMEX Motion is due to be denied with respect to the portion of the fraud claim premised on the SPE discounts, and granted with respect to Armstrong's remaining allegations of fraud in Count III of the SAC.

### C. Count IV: Unjust Enrichment

In Count IV of the SAC, Armstrong asserts a claim of unjust enrichment against CEMEX. Under Florida law,[13] a claim for unjust enrichment requires proof of: "'(1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.'" United Techs. Corp. v. Mazer, 556 F.3d 1260, 1270 (11th Cir. 2009) (quoting

---

[13]     The parties agree that Florida law governs this claim. See CEMEX Motion at 13; Response to CEMEX at 24-25.

Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006)). A claim for unjust enrichment is equitable in nature, and thus, is not available when there is an adequate legal remedy. See Bowleg v. Bowe, 502 So. 2d 71, 72 (Fla. Dist. Ct. App. 1987) (per curiam).

In support of its request for dismissal of Count IV, CEMEX asserts that this claim is precluded by the existence of the Distribution Agreement. See CEMEX Motion at 13 (citing Rushing v. Wells Fargo Bank, N.A., 752 F. Supp. 2d 1254, 1265 (M.D. Fla. 2010) ("A claim for the equitable remedy of unjust enrichment may not be brought if the parties have a valid contract covering the same subject matter as the unjust enrichment claim."); White Constr. Co., Inc. v. Martin Marietta Materials, Inc., 633 F. Supp. 2d 1302, 1332 (M.D. Fla. 2009) ("Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.")). In response, Armstrong notes that Rule 8 expressly allows for the pleading of alternative and inconsistent claims. Response to CEMEX at 24-24 (citing Napa Overseas, S.A. v. Nextran Corp., No. 16-20862-CIV-MORENO, 2016 WL 3841677, at *5 (S.D. Fla. July 12, 2016)).

Although Rule 8 does permit alternative and inconsistent pleading, see Rule 8(d)(2)-(3), "[u]njust enrichment can only be pleaded in the alternative to a breach of contract claim where one of the parties asserts that the contract governing the dispute is invalid." Degutis v. Fin. Freedom, LLC, 978 F. Supp. 2d 1243, 1265 (M.D. Fla. 2013) (citations omitted). Here, neither CEMEX nor Armstrong disputes the validity of the Distribution Agreement. See generally CEMEX Motion; Response to CEMEX. Moreover, Armstrong's claim of unjust enrichment does not exist outside of the contract, as the claim

is premised on CEMEX obtaining profits from sales which under the terms of the Distribution Agreement, it was not permitted to make.[14]   Under these circumstances, Armstrong's attempt to cast its unjust enrichment claim as an "alternative" claim is unavailing.  See William Ryan Homes Fla., Inc. v. Whitney Nat'l Bank, No. 8:12-cv-1575-T-33TGW, 2012 WL 4328769, at *5 (M.D. Fla. Sept. 20, 2012) (because "the parties do not contest (1) that a valid contract exists between William Ryan Homes and Whitney National Bank and (2) that the instant dispute arises out of this contractual relationship," the plaintiff could not also assert a claim for unjust enrichment).  In light of the foregoing, the Court concludes that the CEMEX Motion is due to be granted to the extent that the unjust enrichment claim in Count IV of the SAC will be dismissed.

### D.  Count V: Civil Conspiracy

Next, the Court turns to the civil conspiracy claim set forth in Count V.  To state a claim for civil conspiracy pursuant to Florida law,[15] one must allege: "(1) an [agreement] between two or more parties; (2) to do an unlawful act or do a lawful act by unlawful means; (3) the doing of some overt act in [furtherance] of the conspiracy; and (4) damage to [the] plaintiff as a result of the acts done under the conspiracy."  See, e.g., TracFone Wireless, Inc. v. Pak China Grp. Co. Ltd., 843 F. Supp. 2d 1284, 1301 (S.D. Fla. 2012); see also Philip Morris USA, Inc. v. Russo, 175 So. 3d 681, 686 n. 9 (Fla. 2015).  Critically, a claim for civil conspiracy will not lie unless the plaintiff alleges an underlying civil wrong, done pursuant to the conspiracy, which results in damage to the plaintiff.  See Marriott

---

[14]   Armstrong argues that CEMEX inequitably obtained profits by selling Armstrong Ceiling Products in New York rather than Florida.  Response to CEMEX at 25.  That is the very conduct that is governed by the Distribution Agreement and which forms the basis of Armstrong's breach of contract claim.

[15]   CEMEX applies Florida law when analyzing this claim, see CEMEX Motion at 14-15, and Armstrong cites to no law in its discussion of the sufficiency of its civil conspiracy claim.  Instead, it appears to rely on the sufficiency of its pleading of the underlying tort.  In that regard, Armstrong cites only to Florida law.  The Court will apply Florida law.

Int'l v. Am. Bridge Bahamas, Ltd., 193 So. 3d 902, 909 (Fla. Dist. Ct. App. 2015). Moreover, the "independent civil wrong on which the civil conspiracy is dependent must be alleged in the complaint." Id. If the claim for the underlying civil wrong fails, then it cannot serve as the basis for the conspiracy claim. See Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1067 (11th Cir. 2007) (citation omitted) (applying Florida law); see also 2002 Irrevocable Trust for Richard C. Hvizdak v. Huntington Nat'l Bank, No. 2:08-CV-556-FTM-99DNF, 2008 WL 5110778, at *11 (M.D. Fla. Dec. 1, 2008) (having dismissed the fraud claim, the court must "dismiss the civil conspiracy claim as there is no longer an underlying tort or underlying unlawful act to form the basis of a conspiracy.").

Here, CEMEX argues that Armstrong's civil conspiracy claim should be dismissed because Armstrong fails to adequately plead the existence of any underlying unlawful act. See CEMEX Motion at 14-15. In response, Armstrong asserts that it's claims of fraud, deceptive trade practices, and RICO support its conspiracy claim. Response to CEMEX at 25. However, a review of the SAC fails to support that contention. In Count V of the SAC, Armstrong specifically asserts that CEMEX and Metro "were co-conspirators in the fraud and misrepresentations alleged in paragraphs 150 through161." See SAC at ¶ 174. Indeed, in the first paragraph of its conspiracy claim Armstrong incorporates all of the allegations of the fraud claim, paragraphs 150 through 161, but none of the allegations of the FDUTPA or RICO claims. See generally SAC ¶¶ 173-178. As such, Armstrong's conspiracy claim is supported by the surviving claim of fraud in Count III of the SAC.[16]

---

[16] Armstrong cannot amend or alter its SAC by argument presented in its brief. See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1313 (11th Cir. 2004) ("The central issue in this case is whether a non-moving party plaintiff may raise a new legal claim for the first time in response to the opposing party's summary judgment motion. We hold it cannot.") (footnote omitted). That Gilmour dealt with a response to a summary judgment motion rather than a motion to dismiss is of no consequence. Had Armstrong wanted to amend the SAC, it was required to file a properly supported motion to amend its SAC. See Rule 15; Long v. Satz, 181 F.3d 1275, 1279 (11th Cir. 1999); see also McGinley v. Fla. Dep't of Highway Safety and

For this reason, the CEMEX Motion is due to be denied with respect to Armstrong's claim for civil conspiracy in Count V of the SAC.[17]

### E. Count VII: Violation of FDUTPA (Fla. Stat. § 501.201, et seq.)

To state a claim under FDUTPA, a party must allege (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. Intercoastal Realty, Inc. v. Tracy, 706 F. Supp. 2d. 1325, 1333 (S.D. Fla. 2010). FDUTPA's stated purpose is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2). The statute does not define "unfair and deceptive act or practice." Intercoastal Realty, 706 F. Supp. 2d at 1333. However, "[t]he concept of 'unfair and deceptive' conduct is extremely broad," TempPay, Inc. v. Biltres Staffing of Tampa Bay, LLC, 945 F. Supp. 2d 1331, 1344 (M.D. Fla. 2013) (citing cases), and "the provisions of the [FDUTPA] are to be 'construed liberally[,]'" Intercoastal Realty, 706 F. Supp. 2d at 1333 (citing FLA. STAT. § 501.202). An unfair practice is one that "'offends established public policy' or is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" Intercoastal Realty,

---

Motor Vehicles, 438 Fed. Appx. 754, 757 (11th Cir. 2011) (affirming denial of leave to amend where plaintiff did not set forth the substance of the proposed amendment); United States ex. rel. Atkins v. McInteer, 470 F.3d 1350, 1361-62 (11th Cir. 2006) (same). That it did not do.

    Notably, construing Armstrong's conspiracy claim broadly to include Armstrong's FDUTPA and RICO violations would make no difference. For the reasons set forth next, in section III. E. of this Order, the FDUTPA claim is due to be dismissed, and as a result, cannot support the civil conspiracy claim. And while Armstrong's RICO claim survives dismissal, Armstrong fails to suggest why its civil conspiracy claim based on a conspiracy to commit RICO violations likely would not be entirely redundant of the claim in Count IX which alleges a RICO conspiracy.

[17]     Because CEMEX asserted a complete failure to allege any underlying tort, neither it nor Armstrong addressed the question of whether the civil conspiracy claim must be limited only to damages flowing from the SPE discounts. The Court declines to resolve the issue without input from the parties and thus will not do so sua sponte.

706 F. Supp. 2d at 1333 (citing <u>PNR, Inc. v. Beacon Prop. Mgmt., Inc.</u>, 842 So. 2d 773, 777 (Fla. 2003)).

In this case, Armstrong alleges that CEMEX engaged in deceptive and unfair conduct by, among other things, misrepresenting the amount of in-territory sales for which it was entitled to discounts, encouraging its employees to cover up out-of-territory sales by lying to and misleading Armstrong, and misrepresenting to Armstrong the true recipient and destination of many of its sales. <u>See</u> Response to CEMEX at 27-28 (citing SAC ¶¶ 94-100, 103-08, 191-92). Armstrong further alleges that both CEMEX and Metro engaged in deceptive and unfair conduct by conspiring to transship Ceiling Products outside of CEMEX's contractually-assigned territory for resale elsewhere, which in turn involved efforts to conceal their activities, such as dealing in cash and removing SKU codes from certain Products. <u>See</u> Response to CEMEX at 27 (citing SAC ¶¶ 190, 195). Armstrong also alleges that Metro misused "Armstrong's name and [P]roduct names to make it appear that it was an authorized dealer of Armstrong Ceiling Products." SAC ¶ 193. In doing so, Armstrong avers that CEMEX and Metro's deceptive acts had the effect of deceiving or confusing Armstrong's customers inasmuch as they were led to believe that Metro was an authorized dealer of Armstrong's Products. <u>See</u> <u>id.</u>

CEMEX challenges Armstrong's FDUTPA claim on three fronts. First, it asserts that – because it complied with the territorial restriction provisions of the Distribution Agreement – "fail[ure] to obey some further territorial restriction not embodied in the Distribution Agreement and to which the contracting parties never agreed, cannot amount to an unfair or deceptive act or practice." CEMEX Motion at 15 (citations and internal quotations omitted). Next, it asserts that Armstrong's FDUTPA claim must be dismissed

because Armstrong is seeking to recover consequential damages rather than actual damages, and FDUTPA only "authorizes recovery of actual damages." Id. at 16-18. Last, CEMEX contends that the FDUTPA claim fails due to Armstrong's failure to allege deceptive or unfair conduct that is likely to cause consumer injury. See CEMEX Motion at 19-21. Although the Court is not persuaded by CEMEX's first two arguments,[18] its final contention – that Armstrong fails to allege a plausible claim of deceptive conduct likely to cause consumer injury – carries the day.

In responding to CEMEX's consumer injury argument, Armstrong first advocates for a broader interpretation of the FDUTPA statutes, specifically one that protects the commercial interests of legitimate business enterprises regardless of consumer injury. See generally Response to CEMEX at 31-32. Alternatively, Armstrong argues that if it is required to allege consumer harm, it has done so. See id. at 31-32. Neither contention is well taken.

Prior to 2001, the statutory language of FDUTPA limited the class of plaintiffs who could file suit for money damages to "consumers who have suffered a loss as a result of a violation of [FDUTPA]." Fla. Stat. § 501.211(2); see also James D. Hinson Electrical Contracting Co. v. Bellsouth Telecommunications, Inc., No. 3:07-cv-598-J-32MCR, 2008 WL 360803 (M.D. Fla. Feb. 8, 2008). However, in 2001, the Florida legislature amended

---

[18] While the Court will not engage in a robust discussion of these two arguments, two brief points merit mention. First, with regard to CEMEX's claim that Armstrong fails to identify an unfair or deceptive act or practice, the Court notes that CEMEX's contention is based entirely on CEMEX's interpretation of the Distribution Agreement which Armstrong vehemently disputes, and which the Court has declined to accept at this stage of the proceedings. See supra at 21-22. Next, turning to CEMEX's assertion that the FDUTPA claim should be dismissed because Armstrong seeks recovery only of consequential damages, the Court finds that CEMEX simply reads Armstrong's SAC too narrowly. While Armstrong may seek some consequential damages, it undoubtedly seeks actual damages as well, not the least of which is reimbursement of the discounts, including SPEs, Armstrong claims that CEMEX fraudulently obtained. See SAC at ¶¶ 114, 130, 133, 135, and 191.

the statute to replace the word "consumer" with the word "person." See Fla. Stat. § 501.211(2) (2007). In doing so, the legislature broadly expanded the group of plaintiffs who could bring a claim for money damages under FDUTPA. See James D. Hinson Electrical Contracting Co., 2008 WL 360803, at *3 (collecting cases); Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc., 169 So. 3d 164, 168-69 (Fla. 4th DCA 2015). In Caribbean Cruise Line, Florida's Fourth District Court of Appeal, noting the "well-established presumption that the legislature intends to change a law when it amends a statute" concluded, after analyzing the 2001 amendments, that a plaintiff no longer has to be a consumer to have standing to bring a FDUTPA claim. Id. at 169; see also Bailey v. St. Louis, 196 So. 3d 375, 383 (Fla. 2nd DCA 2016) (finding that a corporate competitor could bring a FDUTPA damages claim under the amended statute because "section 501.211(2) evinces a legislative directive that the remedy of damages is not limited to a consumer.")

That an entity other than a consumer can bring a FDUTPA claim does not mean, however, that "[h]arm to consumers is not required" as suggested by Armstrong. Response to CEMEX at 31. To the contrary Caribbean Cruise Line unequivocally instructs that a plaintiff must "prove that there was injury or detriment to consumers in order to satisfy all the elements of a FDUTPA claim." Caribbean Cruise Line, 169 So. 3d at 169 (emphasis in original). The court explained that the Florida Supreme Court defines the term "unfair practice" as used in FDUTPA as an act "that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Id. (emphasis in original) (quoting PNR, 842 So. 2d at 777). The Florida Supreme Court similarly defines the word "deception" as used in FDUTPA as a

"representation, omission, or practice that is likely to mislead the <u>consumer</u> acting reasonably in the circumstances, to the <u>consumer's detriment</u>." <u>Id.</u> (quoting <u>PNR</u>, 842 So. 2d at 777). As such, to state a FDUTPA claim, the <u>Caribbean Cruise Line</u> decision instructs that Armstrong must allege facts plausibly suggesting that CEMEX's actions were likely to cause consumer harm.

The cases cited by Armstrong as supporting a contrary view are unavailing. <u>See</u> Response to CEMEX at 31. Both <u>Bailey</u> and <u>e-ventures Worldwide, LLC v. Google, Inc.</u>, 188 F. Supp. 3d 1265 (M.D. Fla. 2016) stand for the proposition that a person or entity other than a "consumer" may bring a FDUTPA claim. <u>Bailey</u>, 196 So. 3d at 383; <u>e-ventures</u>, 188 F. Supp. 3d. at 1276. Neither addresses the question of whether such a person or entity can bring a FDUTPA claim in the absence of consumer harm. Armstrong's reliance on this Court's prior decision in <u>Arbitron v. Renda Broadcasting Corp.</u>, No. 3:13-cv-716-J-34JRK, 2014 WL 1268587 (M.D. Fla. March 27, 2014) is similarly unpersuasive. To the extent <u>Arbitron</u> is read as permitting a claim to proceed in the absence of consumer harm, the decision was reached without the benefit of the <u>Caribbean Cruise Lines</u> guidance, which this Court is bound to follow. <u>See</u> <u>McMahan v. Toto</u>, 311 F.3d 1077, 1080 (11th Cir. 2002) (recognizing that in the absence of a decision by the Florida Supreme Court on an issue of Florida law, federal courts are bound to follow the decisions of Florida's intermediate state courts unless the court concludes that the Florida Supreme Court would decide the issue differently.); <u>see also</u> <u>Pardo v. State</u>, 596 So. 2d 665, 666 (Fla. 1992) ("The decision of the district courts of appeal represent the law of Florida unless and until they are overruled by the Florida Supreme Court."). Here, the Court, which is bound to follow the law as set forth in <u>Caribbean Cruise Line</u>,

concludes that Armstrong must allege consumer injury for its FDUTPA claim to survive dismissal.  See also SMS Audio v. Belson, No. 9:16-CV-81308-MIDDLEBROOKS, 2017 WL 1533941, at *4-*5 (S.D. Fla. Mar. 9, 2017) (citing Caribbean Cruise Line and concluding that summary judgment was precluded where defendants "offer[ed] evidence creating a genuine issue of material fact as to whether any consumer suffered a detriment as a result of their representations").

Armstrong alternatively contends that it has, in fact, alleged harm to consumers. See Response to CEMEX at 31-32.  In particular, Armstrong cites to its allegations indicating that the CEMEX scheme, which allowed Metro to hold itself out as an authorized Armstrong distributor, ultimately deceived, confused, and misled consumers. See id. (citing SAC ¶¶ 117, 131, 193).  Notably, the allegations of the SAC to which Armstrong cites in its Response to CEMEX relate predominantly to Metro's actions rather than those of CEMEX.  Armstrong fails to suggest how Metro's actions would support its FDUTPA claim against CEMEX.  Regardless, while Armstrong argues that injury to consumers may have occurred, it does not allege any facts supporting a plausible inference that any consumers have or are likely to have suffered damages.  At most, Armstrong alleges that consumers were misled to believe that Metro was an authorized distributor.  But Armstrong's allegations do not suggest the consumers received any product other than a true Armstrong Ceiling Product or that the consumer suffered any harm by virtue of having purchased Armstrong Ceiling Products from a non-authorized distributor.  Thus, even assuming Armstrong's factual allegations are true, as the Court must, Armstrong has failed to "raise a right to relief above the speculative level" with respect to this element of the FDUTPA claim.  Twombly, 550 U.S. at 555 (citation omitted).

Accordingly, the Court concludes that the CEMEX Motion is due to be granted with respect to this claim, and Armstrong's claim for violation of FDUTPA in Count VII of the SAC is due to be dismissed.

### F.  Counts VIII & IX: RICO & RICO Conspiracy

Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).[19] To recover under RICO, "'a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts.'"  See Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1348 (11th Cir. 2016) (quoting Ray v. Spirit Airlines, Inc., 767 F.3d 1220, 1224 (11th Cir. 2014)).  In addition, a plaintiff must show "'(1) the requisite injury to business or property, and (2) that such injury was by reason of the substantive RICO violation.'"  Id. (quoting Williams v. Mohawk Indus., Inc., 465 F.3d 1277, 1282-83 (11th Cir. 2006) abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 714-15 (11th Cir. 2014)); see also Lawrie v. Ginn Dev. Co., LLC, 656 Fed. Appx. 464, 467 (11th Cir. 2016) (per curiam).  Significantly, "the RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes."  See Boyle v. United States, 556 U.S. 938, 944 (2009) (internal quotation omitted).  As such, although the statute was initially enacted to fight organized crime, its application is not limited to patterns of conduct "'characteristic either of organized crime in the traditional sense, or of an organized-crime-

---

[19]     Armstrong's federal RICO claims are governed by federal law.

type perpetrator, that is, of an association dedicated to the repeated commission of criminal offenses.'" See Ray, 836 F.3d at 1348 (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 243 (1989)).

CEMEX first argues that Armstrong's RICO claim is yet another attempt to rewrite the Distribution Agreement to include territorial restrictions that run counter to CEMEX's interpretation of the "unambiguous language" of the contract. See CEMEX Motion at 22. However, because the Court has declined to adopt CEMEX's interpretation of the Distribution Agreement at this time, see supra at 21-22, this argument is unavailing. Alternatively, CEMEX maintains that Armstrong's allegations amount to nothing more than a breach of contract claim, "which cannot be transmogrified into a RICO claim by the facile device of charging that the breach was fraudulent, indeed criminal." CEMEX Motion at 23 (quoting Helios Int'l S.A.R.L. v. Cantamessa USA, Inc., No. 12 Civ. 8205, 2013 WL 3943267, at *9 (S.D.N.Y. July 31, 2013)). However, in making this argument, CEMEX cites only to nonbinding out of circuit case law and fails to address or even acknowledge Eleventh Circuit precedent. See generally CEMEX Motion at 23. In Arabian American Oil Co. v. Scarfone, 939 F.2d 1472, 1478 (11th Cir. 1991) [hereinafter AAOC] (per curiam), the Eleventh Circuit noted that "many RICO cases involve contract disputes." Id. (citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499 (1985)). Later, in LCBI v. Renta, 530 F.3d 1339 (11th Cir. 2008), the Eleventh Circuit reaffirmed the proposition from AAOC that federal law "permits RICO claims even when a breach of contract claim would also lie against the RICO defendant." Id. at 1350-51. Given this Eleventh Circuit precedent, CEMEX's alternative argument fails, and the RICO claim remains at issue here.

CEMEX's sole argument in support of dismissal of the RICO conspiracy claim asserted in Count IX of the SAC is that "[b]ecause the [SAC] fails to state a claim for a substantive RICO violation, Armstrong's RICO conspiracy claim fails as well."  CEMEX Motion at 23-24.  The Court, however, has rejected CEMEX's narrow challenges to the RICO claim.  As such, CEMEX's attempt to obtain dismissal of the RICO conspiracy claim on this basis fails as well.  The CEMEX Motion is due to be denied with regard to Armstrong's claim for violation of the RICO Act in Count VIII of the SAC as well as its RICO conspiracy claim in Count IX. [20]

## IV. Conclusion

In accordance with the foregoing, it is hereby **ORDERED**:

1.  CEMEX Construction Materials Florida, LLC's Motion to Amend Motion to Dismiss (Doc. No. 71) is **DENIED**.

2.  Plaintiff/Counterclaim Defendant CEMEX Construction Materials Florida, LLC's Motion to Dismiss Second Amended Counterclaim and Supporting Memorandum of Law (Doc. No. 63) is **GRANTED, in part, and DENIED, in part,** as follows:

    A.  The CEMEX Motion is **GRANTED** to the extent that the following claims are dismissed:

        i.  any portion of Defendant/Counterclaim Plaintiff Armstrong World Industries Inc.'s claim of fraud in Count III that does not relate to the extension of SPE discounts to CEMEX;

---

[20]  The Court expresses some skepticism as to the ultimate viability of the RICO claims.  But based on the arguments before the Court at this time, the claims are sufficiently pled.

ii.   Defendant/Counterclaim Plaintiff Armstrong World Industries Inc.'s claim for unjust enrichment in Count IV; and

iii.   Defendant/Counterclaim Plaintiff Armstrong World Industries Inc.'s claim for violation of FDUTPA, Fla. Stat. § 501.201 et seq., in Count VII.

B.    In all other respects, the CEMEX Motion is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida, on February 15, 2018.

**MARCIA MORALES HOWARD**
United States District Judge

lc24

Copies to:

Counsel of Record